## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VICTORIA GEIST, Mother and** | : | **CIVIL ACTION** |
| **Natural Guardian of Keshana Wilson,** | : | |
| **A Minor,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 11-07532** |
| | : | |
| **JASON AMMARY, ET AL.,** | : | |
| **Defendants.** | : | |

### M E M O R A N D U M

**Stengel, J.**                                                      **August 21, 2014**

This is a § 1983 action against a police officer and the City of Allentown brought by Victoria Geist on behalf of her daughter, Keshana Wilson. The plaintiff's excessive force claim and failure-to-train claim stem from a school police officer tasing Ms. Wilson in the groin. Much of the incident is caught on a security tape. The defendant has filed a motion for summary judgment.  For the following reasons, I will deny this motion.

### I.    BACKGROUND[1]

Victoria Geist is the mother of Keshana Wilson, who was fourteen years old at the time of the alleged incident.[2] At that time, Ms. Wilson was about 5 foot, 8 1/2 inches and about 190 pounds.[3] She was in her first year at Allen Dieruff High School in Allentown,

---

[1] Because the plaintiff disputes most of the facts put forward by the defendants as "undisputed," the information contained in this section cites directly to the complaint and the exhibits in the record, rather than the statement of undisputed facts.

[2] Compl., Doc. No. 1 at ¶¶ 2, 7.

[3] See Wilson Medical History and Physical Exam, Doc. No. 65, Ex. V (9/30/2011); Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 152.

PA.[4] Defendant Jason Ammary is a police officer employed by the Allentown Police Department, who was assigned as a School Resource Officer (SRO) at Dieruff High School beginning in 2011.[5]

On Thursday, September 29, 2011, Ms. Wilson was walking in the street near Dieruff High after the students at the school were dismissed for the day.[6] Ms. Wilson, who is bi-racial, was walking with two other female friends—one of whom was white and one of whom was light-skinned Hispanic.[7] At the same time, Officer Ammary and school security officers were instructing students to disperse and to move out of the roadway.[8]

Subsequently, Officer Ammary grabbed Ms. Wilson's arm from behind without identifying himself as a police officer.[9] Officer Ammary did not seize or touch the two

---

[4] Id. at ¶ 7; Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 92, 120.

[5] Officer Ammary was appointed to the position of School Resource Officer on June 15, 2009. See Ammary Letter Appointing to SRO Position, Doc. No. 65, Ex. H (Jun. 12, 2009). He began working as an SRO at Dieruff High in 2011. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 89. Prior to working at Dieruff, Officer Ammary was assigned to work at Harrison-Morton Middle School. Id. at 117.

[6] Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 126.

[7] See id. at 116. Ms. Wilson describes herself as bi-racial; he mother is white while her father is black. Compl., Doc. No. 1 at ¶ 2.

[8] Officer Ammary reported that he first used verbal commands to disperse the crowd by telling them to "keep walking" and saying "let's go, have a nice day." See Affidavit of Probable Cause, Doc. No. 67, Ex. D; Jason Ammary Deposition, Doc. No. 67, Ex. C at 152. He and the school security officers told the crowds seven times to disperse before receiving compliance from the majority of the group. Affidavit of Probable Cause, Doc. No. 67, Ex. D. One student, however, stopped and "bladed his body toward [Officer Ammary] while clenching both fists, and stared directly at [Officer Ammary]." See id.; Jason Ammary Deposition, Doc. No. 67, Ex. C at 141-42. This student was told he was under arrest and placed in handcuffs behind his back without incident. See Affidavit of Probable Cause, Doc. No. 67, Ex. D; Jason Ammary Deposition, Doc. No. 67, Ex. C at 141-42.

[9] What happened prior to the interaction between Officer Ammary and Ms. Wilson is somewhat disputed. After the student was placed under arrest, Officer Ammary claimed that some students "continued to walk slowly and even stop[ped] to check their cellular telephones for text messages." Affidavit of Probable Cause, Doc. No. 67, Ex. D; Jason Ammary Deposition, Doc. No. 67, Ex. C at 138, 146. Officer Ammary claims he directed the remaining students in the roadway to move to the sidewalks or "face arrest." Affidavit of Probable Cause, Doc. No. 67, Ex. D.

white companions, who were walking with Ms. Wilson. Ms. Wilson pulled away and

continued to walk away from Officer Ammary.[10] Officer Ammary then grabbed both her

arms and twisted her around to face away from him.[11] He pushed her against a parked car

nearby.[12] A struggle between them ensued.[13]

---

He reported that Ms. Wilson and two unidentified females "walked slowly and in the middle of the street uttering profanities…to incite the crowd of students." Id.; Jason Ammary Deposition, Doc. No. 67, Ex. C at 146-47.

Ms. Wilson claims that she was walking toward the sidewalk, in compliance with Officer Ammary's orders to disperse when he first approached her. Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 126. She claims she was in the street because she needed to cross it. Id. Ms. Wilson claims that she did not see Officer Ammary Wilson until he grabbed her arm. Id. at 133. She heard the security officers telling the crowds to disperse but claims she did not hear Officer Ammary tell her to leave the street. Id. She claimed it was loud when the orders were being given so she was not aware she might be facing arrest. Id. Officer Ammary claims that she saw him and was facing his direction when he approached her. Jason Ammary Deposition, Doc. No. 67, Ex. C at 13.

Why Officer Ammary first approached Ms. Wilson is unclear. In his police report, Officer Ammary stated he "approached Wilson from behind, grabbed both arms, and notified her of being under arrest." Affidavit of Probable Cause, Doc. No. 67, Ex. D. In his report, Officer Ammary also stated that earlier that morning, he had "observed and overheard Wilson stating to two other females that she was going to 'fuck her up after school and didn't care about the police.'" Id. He reported that he was able to determine the name of the student Ms. Wilson was going to fight. Id.

This differed slightly from his deposition testimony in which he claimed that he had not intended to arrest Ms. Wilson when he first grabbed her wrist. Jason Ammary Deposition, Doc. No. 67, Ex. C at 155-56, 161. He also testified that he had not met Ms. Wilson prior to the incident in question nor did he know who she was. Id. at 116, 157 ("Q: It was coincidental that she was the one that you had a report on earlier; correct? A. Correct."). He had been aware that she might be involved with a local gang from other investigations with which he was involved. Id. at 116-121.

[10] See Affidavit of Probable Cause, Doc. No. 67, Ex. D (She "twisted away and broke free."); Jason Ammary Deposition, Doc. No. 67, Ex. C at 165.

Ms. Wilson admitted she did see that Officer Ammary was reaching for her arm when she first turned around but did keep walking. Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 137.

[11] Compl., Doc. No. 1 at ¶ 8. See Affidavit of Probable Cause, Doc. No. 67, Ex. D (Officer Ammary "immediately grabbed Wilson and brought both arms behind her back again, but she continued to resist by struggling."); Jason Ammary Deposition, Doc. No. 67, Ex. C at 165.

[12] See Affidavit of Probable Cause, Doc. No. 67, Ex. D; Jason Ammary Deposition, Doc. No. 67, Ex. C at 165-66, 171-73; Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 137.

[13] How this struggle played out is unclear from the record. According to Officer Ammary, Ms. Wilson then rotated around to face him. Affidavit of Probable Cause, Doc. No. 67, Ex. D. He claims that she struck him underneath his chin sending his head backwards and also struck him "with several elbows to the sides of [his] head and body." Id. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 173-82. At that point, Officer Ammary considered her a "mid-level assailant." Affidavit of Probable Cause, Doc. No. 67, Ex. D; Jason Ammary Deposition, Doc. No. 67, Ex. C at 166, 181, 190. At that time, he pushed away from her and stepped back so that he could deploy his Taser. Affidavit of Probable Cause, Doc. No. 67, Ex. D; Jason Ammary Deposition, Doc. No. 67, Ex. C at 183-85.

At one point, Officer Ammary stepped away from Ms. Wilson and deployed his Taser.[14] The Taser ejected barbs attached to electrical wires.[15] These barbs hit Ms. Wilson in the lower abdomen and groin.[16]After she was hit in the groin, Ms. Wilson fell to the ground.[17] She remained on the ground until she was transported to the hospital by ambulance, to have the barbs removed.[18] Part of the incident was captured on a school security video.

---

Ms. Wilson admits trying to turn around to ask him why she was being arrested. Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 137-38. According to Ms. Wilson, she was then "flipped around" and that Officer Ammary "put his forearm on [her] neck." Id. at 138. She claims she began to struggle with him because she has asthma and had difficulty breathing. Id.

[14] See Affidavit of Probable Cause, Doc. No. 67, Ex. D.

Ms. Wilson claims she put her hands up when Officer Ammary stepped away from her. Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 116, 141. Officer Ammary claims she did not have her hands up until he tasered her. Jason Ammary Deposition, Doc. No. 67, Ex. C at 185, 194-95.

[15] This method of tasering is different than "dry stun mode," in which officers apply the Taser directly to a person's body in order to give them an electrical shock.

[16] See St. Luke's Emergency Department Record for Keshana Wilson, September 29, 2011 at 3:30 p.m., Doc. No. 65, Ex. Z; City of Allentown Paramedics record for Keshana Wilson on September 29, 2011, Doc. No. 65, Ex. BB.

According to Officer Ammary, he "aimed the Taser's laser dot slightly below" Ms. Wilson's backpack, which he claims had fallen in front of her body. Affidavit of Probable Cause, Doc. No. 67, Ex. D.

[17] Ms. Wilson fell to the ground as she received a five-second burst of "incapacitation." Affidavit of Probable Cause, Doc. No. 67, Ex. D.

[18] What happened while Ms. Wilson was on the ground is also unclear. Officer Ammary claimed he advised her at that time to "not move," "stop resisting," and to "stay on the ground." Affidavit of Probable Cause, Doc. No. 67, Ex. D. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 195. He reported that she complied with these commands. Affidavit of Probable Cause, Doc. No. 67, Ex. D. One of the security officers present placed handcuffs on Ms. Wilson, at the direction of Officer Ammary. Id.; Jason Ammary Deposition, Doc. No. 67, Ex. C at 199.

Ms. Wilson claims that she had asked Officer Ammary for her asthma inhaler while she was on the ground but that he denied her request and ignored her. See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 146, 164-65. Ms. Wilson never used her inhaler but claims she did not have an attack because she was able to calm her breathing after 20 minutes. Id. at 169, 172. Her medical record shows that Ms. Wilson did have asthma. See St. Luke's Emergency Department Record for Keshana Wilson, September 29, 2011 at 3:30 p.m., Doc. No. 65, Ex. Z (stating that Ms. Wilson was prescribed asthma medication).

Ms. Wilson also claims that Officer Ammary made comments about her economic status while laughing when she was handcuffed on the ground. See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 146, 163. She claims that he made a comment in the ambulance that Ms. Wilson's "ugly face ruined [his] lunch." Id. at 168.

Four or five security officers from the school were also present at the scene of the incident.[19] After the tasing, crowds of students watching the incident began yelling obscenities at Officer Ammary.[20] Another disruptive student was placed under arrest.[21] Ms. Wilson was later adjudicated delinquent on the charges of Failure to Disperse and Resisting Arrest.

On December 7, 2011, Ms. Geist, on behalf of Ms. Wilson, filed this action against Officer Ammary and the City of Allentown under §1983, alleging excessive force and Monell liability. As a result of the tasing, Ms. Wilson alleges that she suffered pain, emotional distress, and humiliation.[22] I previously dismissed the plaintiff's claims for false arrest and retaliatory filing of charges.[23] I had also referred several discovery disputes to the Honorable Magistrate Judge Henry Perkin, which he has since resolved.[24] The defendants now move for summary judgment.

---

[19] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 133-34.

[20] Affidavit of Probable Cause, Doc. No. 67, Ex. D.

[21] Id.

[22] Compl., Doc. No. 1 at ¶ 16. See also St. Luke's Emergency Department Record for Keshana Wilson, September 29, 2011 at 3:30 p.m., Doc. No. 65, Ex. Z (stating that "Pt. complaining of pain at taser sight [sic]"); City of Allentown Paramedics record for Keshana Wilson on September 29, 2011, Doc. No. 65, Ex. BB (stating that Ms. Wilson was complaining of pain around the barb wounds). The doctor had indicated that skin infection might be possible as a result of the Taser wounds. See St. Luke's Emergency Department Record for Keshana Wilson, September 29, 2011 at 3:30 p.m., Doc. No. 65, Ex. Z.

Ms. Wilson claims that she continues to have nightmares as a result of the incident. See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 198. She claims kids at school have teased her about the incident and have called her "taser bitch." Id. at 199-201. However, she has not sought psychological treatment about the teasing or nightmares. Id. at 200.

[23] See Doc. No. 35 and 36; Geist v. Ammary, No. 11–07532, 2012 WL 6762010 (E.D. Pa. Dec. 20, 2012).

[24] See Doc. No. 31, 42. Judge Perkin granted in part and denied in part motions related to the production of the plaintiff's Facebook records. See Doc. No. 34. He denied a motion for sanctions and a motion to compel the deposition of Carissa Thomas, one of the students who had been walking with Ms. Wilson at the time of incident who is a non-party in this action. He also denied a motion for protective order to preclude the deposition of Officer Michael Beidelman. See Doc. No. 71, 72, 73.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.     DISCUSSION

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). The plaintiff asserts both an excessive force claim against Officer Ammary and a failure-to-train claim against the City of Allentown. I will address each in turn.

### a.   Claim of Excessive Force Against Officer Ammary

The plaintiff alleges that the use of the Taser on a fourteen-year-old girl during an arrest, as well as Officer Ammary's decision to shoot the Taser where he did, are evidence that the force used was "excessive." The use of excessive force during an arrest is a cognizable constitutional violation under the Fourth Amendment. Bell v. Wolfish, 441 U.S. 520, 534 n. 16 (1979). The Fourth Amendment provides, "The right of the

people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated."[25] An arresting officer is justified in using "substantial force" as part of the arrest when the person is convicted of the crime. Nelson v. Jashurek, 109 F.3d 142, 146 (3d Cir. 1997). The use of force beyond substantial force during the arrest goes to the question of whether the seizure of the person itself was reasonable. See Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).

Reasonableness is evaluated from the perspective of a reasonable officer on the scene. Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004)(citing Graham v. Connor, 490 U.S. 386, 396 (1989)). Not every push or shove amounts to unreasonableness even if found to be unnecessary later.[26] Id. The reasonableness inquiry must recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving…" Id. at 396-97. The inquiry is objective and does not take into account the officer's subjective bad faith or ill-will. Id. at 399.

"[R]easonableness under the Fourth Amendment should frequently remain a question for the jury." Abraham v. Raso, 183 F.3d 279, 290 (3d Cir.1999). Summary judgment may be possible, however, if the officer's use of force was objectively

---

[25] A seizure occurs when a suspect "submits to the police's show of authority or the police subject him to some degree of physical force." Abraham v. Raso, 183 F.3d 279, 291 (3d Cir.1999). There appears to be no question here that the plaintiff was, in fact, seized in line with the Fourth Amendment definition.

[26] The defendants argue that their motion should be granted because Ms. Wilson was not injured by the tasing. While a jury might disagree with the defendants' assessment of whether Ms. Wilson suffered injuries, this argument is moot. This is the same argument I rejected in the defendants' motion to dismiss. See Memorandum on Defendants' Motion to Dismiss, Doc. No. 35 at 12. "[T]he absence of a physical injury does not necessarily signify that the force used was not excessive." Gulley v. Elizabeth City Police Dep't, 340 Fed. Appx. 108, 110 n. 2 (3d Cir. 2009)(discussing Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir.1997)). "Rather, it is simply one of the circumstances to be considered under the objective reasonableness standard set forth in Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)." Id.

reasonable under the circumstances after all factual disputes have been resolved in favor of the plaintiff. Id. The use of a Taser during an arrest, especially when the suspect is resisting arrest, may be reasonable. See Brown v. Cwynar, 484 Fed.Appx. 676, 681 (3d Cir. 2012)(noting how the use of Taser on a suspect resisting arrest is not inherently "excessive force").[27] Nonetheless, "the deployment of a taser … remains a relatively serious use of force." Ickes v. Borough of Bedford, 807 F.Supp.2d 306, 323 (W.D. Pa. 2011).

How much force is reasonable in effectuating an arrest is based on the "totality of the circumstances," including: 1) the severity of the crime at issue, 2) the immediate threat to the safety of the officers or others that the suspect poses, 3) whether the suspect is resisting or evading arrest, 4) how "violent or dangerous" the suspect is, 5) the "duration" of the force, 6) whether the force was used in making an arrest, and 7) whether the suspect might be armed, and 8) the number of people with whom the police must contend. Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8–9, (1985)); Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir.1997).

### i. Collateral Estoppel Via Ms. Wilson's Adjudication

---

[27] See also Patrick v. Moorman, 536 Fed.Appx. 255, 259 (3d Cir. Aug. 27, 2013)(tasing a fleeing bank robber who was resisting arrest was not excessive force); Woods v. Grant, 665 F.Supp.2d 438, 446 (D. Del. 2009)(granting summary judgment in favor of defendant on plaintiff's claim that tasering amounted to excessive force); Wargo v. Municipality of Monroeville, PA, 646 F.Supp.2d 777, 784 (W.D. Pa. 2009)(finding that use of a Taser did not constitute excessive force when an armed man who was suicidal refused to comply with officer's orders); Schumacher v. Halverson, 467 F.Supp.2d 939, 951-52 (D. Minn. 2006)(use of a Taser in arresting plaintiff was reasonable when plaintiff was arrested for DWI charge at night and officer did not know whether he was armed); McKenney v. Harrison, 635 F.3d 354, 360 (8th Cir. 2011)(finding that the use of a Taser in arresting the plaintiff for misdemeanors was reasonable when plaintiff made a sudden movement toward a window which officers could have reasonable interpreted as an "active attempt to evade arrest by flight" and officer warned plaintiff she might be tased); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)(use of a Taser on belligerent arrestee during traffic stop not excessive force when plaintiff repeatedly failed to follow officer's directives and plaintiff resisted arrest).

The defendant argues that the plaintiff is estopped from arguing that Officer Ammary acted improperly in his initial contact with Ms. Wilson because she was adjudicated delinquent on the charges of disorderly conduct, failure to disperse, and resisting arrest.[28] In Pennsylvania, "summary judgment may be granted in a civil proceeding based upon a guilty plea in a criminal case if the operative facts in the criminal case are identical to those that would be litigated in the civil case." Linnen v. Armainis, 991 F.2d 1102, 1105 (3d Cir.1993)(discussing Commonwealth Dep't of Transp. v. Mitchell, 535 A.2d 581, 585 (Pa. 1987)). The same is true under federal law. See Haring v. Prosise, 462 U.S. 306, 316-317 (1983)(holding that a guilty plea entered in a state criminal proceeding would not bar a subsequent § 1983 action when the later case addressed issues neither actually litigated nor necessary to support the judgment). "Reasonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel." Gregory v. Chehi, 843 F.2d 111, 121 (3d Cir.1988) (quoting Kauffman v. Moss, 420 F.2d 1270, 1274 (3d Cir. 1970)).

---

[28] She was also adjudicated delinquent on the charge of walking on or along the highway, a summary offense. Failure to disperse upon an official order and resisting arrest are misdemeanors in the second degree. Disorderly conduct is a misdemeanor in the third degree. See Order Adjudicating Keshana Wilson (Oct. 20, 2011), Doc. No. 65, Ex. DD.

Pennsylvania's Failure to Disperse statutes states:
> Where three or more persons are participating in a course of disorderly conduct which causes or may reasonably be expected to cause substantial harm or serious inconvenience, annoyance or alarm, a peace officer or other public servant engaged in executing or enforcing the law may order the participants and others in the immediate vicinity to disperse. A person who refuses or knowingly fails to obey such an order commits a misdemeanor of the second degree.

18 Pa.C.S. § 5502.

Pennsylvania's resisting arrest statutes states:
> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa. C.S. § 5104.

The record does not offer the facts on which the juvenile court relied to make its decision. In adjudicating Ms. Wilson, the juvenile court entered an Order without much explanation of its factual or legal findings.[29] For this reason alone, I am disinclined to prevent the plaintiff from using facts about the initial contact with Officer Ammary's conduct.[30]

In addition, a conviction for resisting arrest does not necessarily preclude an arrestee from recovering damages on a § 1983 excessive force claim. See Nelson v. Jashurek, 109 F.3d 142, 145-46 (3d Cir. 1997); Domitrovich v. Monaca, No. 2:08cv1094, 2010 WL 3489137, at *7 (W.D. Pa. Sept. 1, 2010)(finding that conviction foreclosed false arrest and malicious prosecution claims but not excessive force claim). Even if a suspect had been combative at the time of arrest, an excessive force claim would not necessarily be precluded. See Garrison v. Porch, 376 F. App'x 274, 278 (3d Cir. 2010)("A reasonable jury could find that, even considering Garrison's initial behavior which constituted a simple assault, Porch used an unreasonable amount of force in arresting him, and in doing so violated his constitutional rights.").[31] The basis for Ms. Wilson's arrest is separate from the manner in which Officer Ammary carried out the

---

[29] See Order Adjudicating Keshana Wilson (Oct. 20, 2011), Doc. No. 65, Ex. DD.

[30] For example, the court may have adjudicated Ms. Wilson on her disorderly conduct and failure to disperse charge based on her behavior before Officer Ammary made any physical contact with her since there is some evidence that she refused to follow his instructions to disperse. Questioning Officer Ammary's conduct in arresting her would not necessarily serve as a collateral attack on her adjudication.

[31] See also Wilhere v. Delaware Cnty., CIVA 09-22, 2010 WL 1381664, at *1 (E.D. Pa. Apr. 1, 2010)(finding that plaintiff's conviction of disorderly conduct does not preclude the court from considering the plaintiff's version of the facts during arrest because "it is not clear which facts lead to the plaintiff's conviction" and applying the ordinary summary judgment standard).

arrest. This is why I previously dismissed the false arrest claim but allowed the excessive force claim to go forward.[32]

The plaintiff is not estopped from presenting evidence regarding Officer Ammary's conduct during the initial stop nor from arguing that this conduct constituted excessive force.[33] However, she cannot argue that her arrest was unwarranted or invalid and cannot collaterally attack her adjudication. I have not found her arguments pertaining to this motion to attack the validity of her actual arrest but instead to challenge the manner by which Officer Ammary arrested her.

### ii.   Video Evidence Does Not Resolve Factual Disputes

The surveillance video showing Ms. Wilson's tasing has been submitted to the court as part of this motion. Both parties point to video of the Mr. Wilson's arrest as being dispositive of facts in this case. The surveillance camera taping the incident, however, only captured part of the arrest. It had panned to another area of the high school grounds during the initial contact between Mr. Wilson and Officer Ammary and returned to the location of the incident when they were halfway through their encounter. The video shows the two struggling against a parked car and then Officer Ammary pulling away. He then tasered Ms. Wilson. This is captured on video. The video continued to focus on the scene until just after Ms. Wilson was taken away in an ambulance.

---

[32] See Doc. No. 35 and 36; Geist v. Ammary, No. 11–07532, 2012 WL 6762010 (E.D. Pa. Dec. 20, 2012).

[33] The defendants argue that Officer Ammary's testimony that he initially stopped Ms. Wilson to show other students he "meant business" and was stopping her so that other students "would take him seriously" should not be precluded because it calls into question whether Ms. Wilson's arrest was valid. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 156-57. While I recognize that this evidence could serve as a collateral attack on Ms. Wilson's arrest, it also can serve as evidence that Officer Ammary's use of force was unreasonable under those circumstances. As I explain later, it also may show that Officer Ammary was inadequately trained in how to handle unruly groups of teenagers.

Because the video only captures part of the incident, it does not resolve one way or the other facts being disputed regarding the excessive force claim. The events leading to the struggle against the parked car are important to the excessive force analysis because they help show the context of the arrest. The context of the arrest—how many students were present during the initial contact between Ms. Wilson and Officer Ammary, whether Ms. Wilson's behavior in responding to Officer Ammary's request to "move along" threatened his safety or that of those around her, and what other events were happening during their initial contact—is important to the excessive force claim. As I found in deciding the motion to dismiss, the video evidence does not necessarily resolve the facts that remain in dispute.

### iii.  Outstanding Material Factual Disputes

Several facts in dispute are material to the excessive force analysis.[34] First, the plaintiff and defendant offer differing accounts of what was happening on school grounds when Officer Ammary initially made contact with Ms. Wilson. Officer Ammary claims that there were large groups of students gathering on school grounds near where he approached Ms. Wilson.[35] He claims that these students appeared to be ready to fight.[36]

---

[34] The plaintiff disputes many of the facts the defendants put forth as being "undisputed." The record is not as clear as the defendants claim, thereby automatically making these facts "undisputed." For the sake of judicial efficiency, I will address only those that are most important to the summary judgment analysis. Those facts that I do not discuss are not necessarily deemed "undisputed."

[35] He specifically estimated two hundred students who he claimed were being "disorderly." His report states they were in the middle of the street, blocking traffic. See Affidavit of Probable Cause, Doc. No. 67, Ex. D. This sort of occurrence was typical, according to Officer Ammary. He explained during his deposition that the events of the day were no different than any other day and that, in fact, there were less students than normal. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 126.

Ms. Wilson estimated that there were fifty to one hundred students but no more than that. See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 124.

Ms. Wilson, however, recounts that school dismissal as being a little louder than usual but not "too much out of the ordinary."[37] She did not see any large groups gathering nor knew of students planning to fight.[38] These facts speak to the possible threat of safety to the officer and others at the time of the arrest, along with the number of people with which Officer Ammary would need to contend.[39]

Second, the plaintiff's account of her behavior during her struggle with Officer Ammary differs from that of Officer Ammary's recounting of this struggle.[40] Ms. Wilson

---

[36] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 79, 124, 128, 132, 134 (claiming he received reports from an unknown source that rival gangs would fight after school); Affidavit of Probable Cause, Doc. No. 67, Ex. D ("Security personnel advised that several groups of students consisting of rival gangs were attempting to fight."). Officer Ammary also claims that he had received information that Ms. Wilson might be involved in this fight. Jason Ammary Deposition, Doc. No. 67, Ex. C at 86-87, 93. In his police report, Officer Ammary stated that earlier that morning, he had "observed and overheard Wilson stating to two other females that she was going to 'fuck her up after school and didn't care about the police.'" See Affidavit of Probable Cause, Doc. No. 67, Ex. D. He reported that he was able to determine the name of the student Ms. Wilson was going to fight. Id.

However, in his deposition, Officer Ammary testified that he had not met Ms. Wilson prior to the incident in question nor did he know who she was. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 116, 157 ("Q: It was coincidental that she was the one that you had a report on earlier; correct? A. Correct."). He had been aware that she might be involved with a local gang from other investigations with which he was involved. See id. at 116-121. This factual inconsistency raises questions about whether Officer Ammary believed Ms. Wilson was a threat to his safety when he first approached her. The resolution of this factual discrepancy would turn on a jury's estimation of Officer Ammary's credibility.

[37] See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 124.

[38] See id. at 128. The nature of these "crowds" and why they were in that area is unclear. The video does show a number of students around the arrest scene. However, it is unclear whether they were gathered there to fight, as Officer Ammary claims, or whether they stopped to "gape" at what was happening out of curiosity like most people do when something unusual is happening. The video, again, does not show what the area looked like at the time of Ms. Wilson and Officer Ammary's initial contact.

[39] The parties agree that between fifty to two hundred students were in the vicinity of her arrest, watching the incident. See Defendants' Statement of Undisputed Facts, Doc. No. 65-2 at ¶ 93; Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 149; Jason Ammary Deposition, Doc. No. 67, Ex. C at 124. The agreement to this fact does not help much in the analysis. Whether fifty students were present compared to two hundred could change how Officer Ammary was expected to act, under each set of circumstances.

[40] It is clear that Ms. Wilson did resist Officer Ammary's hold on her. But Ms. Wilson's behavior does not dispense with the reasonableness requirement altogether, as I already explained in my memorandum regarding the motion to dismiss in this case. See e.g., Green v. N.J. State Police, 246 Fed. Appx. 158 (3d Cir. 2007) (finding that the plaintiff's admission that during the struggle he came "in contact either by striking or kicking two of the officers," would not, as a matter of logic, necessarily conflict with a finding of excessive force); Gibson v. Mueller, No. 09–6486–NLH–JS, 2012 WL 1079128, at *10 (D.N.J. Mar. 29, 2012) (finding that even where certain facts as alleged in the plaintiff's § 1983 claim contradict facts found in support of the plaintiff's state court conviction, they do not

claims that she was pushing Officer Ammary's arm off of her chest because she was unable to breathe.[41] Officer Ammary, however, indicates that her actions were simply ones of defiance. He claims she struck him several times, including in the face.[42] Ms. Wilson denies striking him or at least doing so intentionally.[43] The video does show part of the struggle between them. However, this graphic depiction could be viewed either way. Essentially, this fact comes down to the credibility of Ms. Wilson and Officer Ammary. Which account is more accurate would be a question for a jury to answer. These facts are important to determining whether a threat of safety was posed to Officer Ammary, how dangerous Ms. Wilson appeared to be, and whether these actions are what Officer Ammary viewed as her resisting arrest.[44]

---

necessarily undermine the plaintiff's allegation in the § 1983 case that the officers used unreasonable force). See also Geist v. Ammary, No. 11–07532, 2012 WL 6762010, at *4-5 (E.D. Pa. Dec. 20, 2012).

The defendants admit that there is a difference in the testimony of Ms. Wilson and Officer Ammary regarding what happened during this struggle, but they argue that they are not material without much explanation of this point. See Defendants' Brief in Support of Summary Judgment, Doc. No. 65-63 at 10.

[41] Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 138-40, 164. I will note that this testimony is consistent with the testimony she gave at her juvenile adjudication hearing because the defendants argue otherwise. See Wilson Juvenile Hearing transcript, Doc. No. 65, Ex. Y at 193.

[42] The juvenile record also raises doubt about whether this happened or whether Ms. Wilson was justified for striking him, if she did. The court determined that Ms. Wilson was guilty beyond a reasonable doubt of failing to disperse upon an official order, resisting arrest, disorderly conduct, and walking in a highway. She was not, however, adjudicated on the charges of aggravated assault, simple assault, and riot. See Order Adjudicating Keshana Wilson (Oct. 20, 2011), Doc. No. 65, Ex. DD.

[43] Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 138-40, 164. I will note that this testimony is consistent with the testimony she gave at her juvenile adjudication hearing because the defendants argue otherwise. See Wilson Juvenile Hearing transcript, Doc. No. 65, Ex. Y at 193.

[44] The juvenile court did not explain its findings for its adjudication as to Ms. Wilson's resisting arrest charge. It is unclear if her actions during the initial contact between her and Officer Ammary—in pulling away from him—were the basis for the adjudication or whether her actions during this struggle were the basis for the adjudication. The defendants' own brief claims that it is Ms. Wilson's turning around after having her hands pulled behind her back which Officer Ammary interpreted as her resisting arrest. See Defendants' Brief in Support of Summary Judgment, Doc. No. 65-3 at 10. The fact that she was adjudicated on the resisting arrest charge but not the assault charges raises a doubt as to which of her actions were considered by the court to be resisting arrest. See Order Adjudicating Keshana Wilson (Oct. 20, 2011), Doc. No. 65, Ex. DD. From what has been presented in the record, I cannot say for certain that her actions during the struggle were what warranted her adjudication of the charge "resisting arrest."

Third, it is disputed what types of warnings were given to Ms. Wilson before force was applied by Officer Ammary and whether Ms. Wilson was actively resisting these commands at the time she was tased. Whether warnings were given prior to tasing is important to showing whether this use of force was appropriate. See Brown v. Cwynar, 484 Fed.Appx. 676 (3d Cir. Jun. 7, 2012)(use of a Taser on plaintiff during arrest not excessive force after officer was called to store to deal with a "disruptive customer" and plaintiff/customer was non-complaint after several requests by officer to stop); Ickes v. Borough of Bedford, 807 F.Supp.2d 306, 313, 324 (W.D. Pa. 2011)(finding that arresting officer's tasering of a handicapped individual was appropriate after the plaintiff was warned that he might be tasered and the plaintiff responded, "Go ahead and taser me.").[45]

---

[45] See, e.g., Gorman v. Warwick Twp., No. 10–CV–6760, 2012 WL 1439076, at *5 (E.D. Pa. Apr. 26, 2012)(finding that tasing was reasonable "after repeated entreaties and warnings by the officers and Plaintiff's continued verbal and physical refusals to comply"); Gruver v. Borough of Carlisle, No. 4:CV 05–1206, 2006 WL 1410816 (M.D. Pa. May 19, 2006) (no excessive force when use of taser was consistent with level of resistance and there was no indication police officers applied any gratuitous force); Armbruster v. Marguccio, Civ. No. 05–344J, 2006 WL 3488969 (W.D. Pa. Dec. 4, 2006) (issue of fact whether arrestee was resisting at the time of the first use of taser, but no excessive force for subsequent taser use when officers reasonably believed arrestee was resisting arrest); Buckley v. Haddock, 292 Fed.Appx. 791, 794 (11th Cir. Sept. 9, 2008)(tasering not an excessive use of force when arrestee did not comply with officer's orders and after the officer "gave Plaintiff ample warning and opportunity to cease resisting before the deputy resorted [to tasing]."); N.A. ex rel. Ainsworth v. Inabinett, No. 2:05-CV-740 DRB, 2006 WL 2709850, at *6 (M.D. Ala. Sept. 20, 2006)(finding that use of Taser on suicidal teen not excessive after officers gave teen two warnings before using Taser and delayed tasering after each warning "in order to solicit Plaintiff's cooperation").

The use of a Taser on a suspect who is no longer resisting arrest has been found to be unconstitutional. See, e.g., Bultema v. Benzie County, 146 Fed.Appx. 28, 35 (6th Cir. Aug. 17, 2005); Parker v. Gerrish, 547 F.3d 1, 8–11 (1st Cir. 2008)(upholding jury verdict that officer used excessive force in tasing an arrestee who insulted the officers but also had complied with their requests and did not resist arrest); Casey v. City of Fed. Heights, 509 F.3d 1278, 1282–87 (10th Cir. 2007) (use of a Taser and related force against a nonviolent misdemeanant who did not flee or actively resist arrest found to be excessive).

The defendants cite to Nardini v. Hackett, No. Civ.A. 00 CV 5038, 2001 WL 1175130 (E.D. Pa. Sept. 19, 2001), to support their position that the use of the Taser was not "excessive." In Nardini, the district court granted summary judgment in favor of arresting officers on an excessive force claim after determining that a reasonable jury could not conclude the amount of force applied was objectively unreasonable. Id. at *6-7. I do not find this case to be helpful. In that case, the officers gave the plaintiff two "explicit warnings" that she would be arrested if she did not cease her conduct. Id. at *1. When she continued, they grabbed her arm to arrest her, and she resisted arrest. Id.

Officer Ammary claims he gave several orders to disperse to Ms. Wilson and then gave her warnings to cease her behavior.[46] Ms. Wilson claims no such warnings were given.[47] If they were, she was unable to hear them.[48] Ms. Wilson also testified that she stopped resisting after Officer Ammary let her go from his hold.[49] She claims she put her hands up when Officer Ammary stepped away from her.[50] Officer Ammary claims she did not have her hands up until he tasered her.[51] Whether Ms. Wilson did comply or not with Officer Ammary's orders and was actively resisting arrest at the time she was tased are factual questions which speak directly to the Graham and Sharrer factors.

Fourth, Ms. Wilson and Officer Ammary offer different accounts of how Ms. Wilson was treated after the tasing. Ms. Wilson claims she was ordered to roll onto her stomach so that she could be handcuffed, further pushing the Taser barbs into her stomach and groin.[52] Officer Ammary claims she remained on her side.[53] The video does

---

[46] Officer Ammary reported that he first used verbal commands to disperse the crowd by telling them to "keep walking" and saying "let's go, have a nice day." Affidavit of Probable Cause, Doc. No. 67, Ex. D. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 152. He and the school security officers told the crowds seven times to disperse before receiving compliance from the majority of the group. Affidavit of Probable Cause, Doc. No. 67, Ex. D.

[47] Ms. Wilson claims that she did not see Officer Ammary Wilson until he grabbed her arm. Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 133. She heard the security officers telling the crowds to disperse but claims she did not hear Officer Ammary tell her to leave the street. Id.

[48] She claimed it was loud when the orders were being given. Id.

[49] Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 138-40, 164. I will note that this testimony is consistent with the testimony she gave at her juvenile adjudication hearing because the defendants argue otherwise. See Wilson Juvenile Hearing transcript, Doc. No. 65, Ex. Y at 190, 193.

[50] See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 116, 141.

[51] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 185, 194-95.

[52] See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 145, 148.

[53] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 202-43.

not have sound, so it is unclear what was said to Ms. Wilson. Another person also blocked the view of Ms. Wilson being handcuffed so it is unclear how that event transpired. She is at one point seen on her stomach, but it is unclear whether she rolled into this position by her own volition or whether she was ordered to do so. If she was ordered to roll on her stomach and remain in this position, a reasonable jury could conclude that this order was force beyond what was needed.[54]

Lastly, the parties dispute where Ms. Wilson's messenger bag was placed at the time she was tased. This fact is important to understanding whether Officer Ammary's tasing Ms. Wilson in her groin was "excessive" under the circumstances. Officer Ammary claims her messenger bag was in front of her, making it difficult for him to aim the Taser higher on her body.[55] Ms. Wilson claims that the bag was on her back and that Officer Ammary had no obstruction in aiming higher on her body.[56]

Given that several material facts are genuinely disputed, summary judgment would not be appropriate as to the plaintiff's excessive force claim.[57]

---

[54] These facts also go to the duration of the force used on Ms. Wilson and whether this would be considered force at all.

[55] Affidavit of Probable Cause, Doc. No. 67, Ex. D.

[56] See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 141, 147. I will note that this testimony is consistent with the testimony she gave at her juvenile adjudication hearing because the defendants argue otherwise. See Wilson Juvenile Hearing transcript, Doc. No. 65, Ex. Y at 193.

[57] The defendants also cite Patrick v. Moorman, 536 Fed.Appx. 255 (3d Cir. Aug. 27, 2013), and Brown v. Cwynar, 484 Fed.Appx. 676 (3d Cir. Jun. 7, 2012), to support their motion on the excessive force claim. These cases are distinguishable. Taser cases within the Third Circuit reflect the fact-sensitive nature of any determination of reasonableness of the use of a Taser on a person and do not establish bright-line rules on when the use of a Taser is appropriate. See Reiff v. Marks, 2011 U.S. Dist. LEXIS 18205 (E.D. Pa. Feb. 23, 2011). In Patrick, the plaintiff was actively fleeing the scene of a bank robbery, a far more serious crime.[57] In Brown, the district court did not find that any material facts were in dispute. 484 Fed.Appx. at 679. See also Brown v. Cuscino, No. 08–1224, 2011 WL 1085892, at *1 (W.D. Pa. Mar. 21, 2011)("For the reasons that follow, the court will grant Cuscino's Motion with respect to all federal question claims because there is no issue of material fact in dispute and Cuscino is entitled to judgment as a matter of law.").

### iv.  Qualified Immunity

Even if material facts remain in dispute, the defendants argue that the excessive

force claim against Officer Ammary should be barred based on the doctrine of qualified

immunity. Qualified immunity is intended to shield government officials performing

discretionary functions, including police officers, "from liability from civil damages

insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."[58] Harlow v. Fitzgerald, 457 U.S.

800, 818  (1982). A defendant has the burden to establish that he is entitled to qualified

immunity. See Beers–Capitol v. Whetzel, 256 F.3d 120, 142 n. 15 (3d Cir. 2001).

Typically, the issue of qualified immunity should be decided early in the litigation.

"Because qualified immunity is 'an immunity from suit rather than a mere defense to

liability ... it is effectively lost if a case is erroneously permitted to go to trial.'" Pearson

v. Callahan, 555 U.S. 223, 231 (2009)(quoting Mitchell v. Forsyth, 472 U.S. 511, 526

(1985) (emphasis and quotation marks omitted)). However, "a decision on qualified

immunity will be premature when there are unresolved disputes of historical fact relevant

to the immunity analysis." Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002). The Third

Circuit has made clear that "a qualified immunity determination must be made in light of

the specific factual context of the case." Thomas v. Independence Township, 463 F.3d

---

[58] Qualified Immunity on a Section 1983 Claim provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

285, 289 (3d Cir. 2006). Qualified immunity, however, may be raised again as a defense after the disputed issues of fact are resolved.[59]

A ruling on qualified immunity requires a two-factor inquiry: 1) a court must consider whether the facts alleged show that the officer's conduct violated a constitutional right when viewed in the light most favorable to the plaintiff; and 2) a court must determine that that right was clearly established. Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004)(citing Saucier v. Katz, 533 U.S. 194, 200-01 (2001)).

Viewing the facts in the light most favorable to the plaintiff, a jury could conclude that Officer Ammary used excessive force when arresting Ms. Wilson.[60] The facts

---

[59] See, e.g., Reiff v. Marks, 08-CV-5963, 2011 WL 666139, at *7 (E.D. Pa. Feb. 23, 2011)("This ruling, however, is without prejudice, and the defendants may raise a qualified immunity defense after the disputed issues of fact are resolved."); Wilhere v. Delaware Cnty., CIVA 09-22, 2010 WL 1381664, at *7 (E.D. Pa. Apr. 1, 2010)("This ruling, however, is without prejudice, and the defendants may raise a qualified immunity defense after the disputed issues of fact are resolved.").

[60] See Shultz v. Carlisle Police Dept., 706 F.Supp.2d 613, 624 (M.D. Pa. 2010)(finding that the qualified immunity defense would be unavailable if a jury concluded that the defendants use of a Taser during an arrest was excessive under the circumstances).

The defendants argue that qualified immunity must apply because Ms. Wilson admitted during her deposition that Officer Ammary could have understood her actions as her resisting arrest. See Defendants' Reply Brief in Support of Motion for Summary Judgment, Doc. No. 68, Ex. A at 4. Whether Ms. Wilson could understand that Officer Ammary was acting as a reasonable officer would in the situation is not dispositive of the issue. This is an issue for the jury, not Ms. Wilson. Her agreeing that he *could* have acted reasonably under the circumstances does not resolve whether the force used was excessive.

The defendants also argue that qualified immunity should apply because Ms. Ammary admits she may have hit Officer Ammary during their struggle. Id. The defendants point to the video as evidence that she did, in fact, hit him. It is not clear from the video whether she hit Officer Ammary in the way he testified she did. Her testimony during her deposition and during her juvenile adjudication hearing do not clearly resolve the issue as well. See Wilson Juvenile Adjudication Hearing Transcript, Doc. No. 65, Ex. Y at 193; Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 140.

The defendants also state that "[t]his conduct *would* give rise to charges of simple assault and aggravated assault." See Defendants' Reply Brief in Support of Motion for Summary Judgment, Doc. No. 68, Ex. A at 6. According to Ms. Wilson's Order of Adjudication, this conduct *did* result in charges of simple assault and aggravated assault. See Order Adjudicating Keshana Wilson (Oct. 20, 2011), Doc. No. 65, Ex. DD. However, Ms. Wilson was *not* adjudicated on those charges. Id. Even if she had, whether she did so intentionally or because he was improperly holding her and she could not breathe is still a fact in dispute that would affect the analysis of whether the force used was excessive.

presented in the record thus far also do not clearly establish that every reasonable officer would have used the level of force employed by Officer Ammary in making the arrest of Ms. Wilson, a minor.[61]

The second factor requires a determination of "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Kopec, 361 F.3d at 776 (quoting Saucier, 533 U.S. at 202)(quotation marks omitted).[62] The defendants claim that qualified immunity is appropriate because Officer Ammary could not have known that the use of a taser device against an assaultive suspect, who had struck him in the face, would be a violation of Ms. Wilson's rights. This inquiry, however, would not be whether the use of a Taser on a combative person was appropriate but whether the use of a Taser on a combative *minor* was appropriate. No case law cited by the parties speaks directly to this issue, and I have not found case law in this Circuit that is directly on point.[63]

---

[61] For example, in describing Ms. Wilson's arrest, Officer Ammary explained that he had grabbed her and was placing her in handcuffs to issue a citation for walking in the highway. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 155-56, 161. Chief Hanna testified that officers typically would only grab people's arms if "effecting an arrest" or "assisting them in some way." See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 147-48. Whether every reasonable officer would have acted in the same way is a question the jury should resolve.

In addition, Officer Ammary did not warn Ms. Wilson before tasing her and only allowed several seconds to elapse between un-holstering his Taser and deploying it. See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 144-45; Jason Ammary Deposition, Doc. No. 67, Ex. C at 186, 190. Whether every reasonable officer would have acted in this way is debatable.

[62] Because the Supreme Court no longer requires courts to address the two-step Saucier procedure in any particular order, I will address both steps of the analysis. See Pearson v. Callahan, 555 U.S. 223, 242 (2009). If one part of the analysis is met, then qualified immunity may be available. See id. at 243-44 (finding that qualified immunity available because no violation of clearly established law).

[63] In my research, I found only three cases outside of this Circuit that might be somewhat analogous to this case. In Johnson v. City of Lincoln Park, a district court found that an officer's tasing of a fourteen-year-old high school boy by a school police officer was not excessive. 434 F.Supp.2d 467, 480 (E.D. Mich. 2006). The student, who had a history of disruptive behavior, first failed to comply with school officials in handing over a Gameboy he was not permitted to have in school. Id. at 469. The school police then intervened and the student failed to comply with their directives. Id. at 469-470. The student then began to struggle, kick, and bite the officers. Id. at 470. The officer then

21

The Third Circuit has interpreted the second inquiry broadly. Kopec, 361 F.3d at 778 (quoting Burns v. County of Cambria, 971 F.2d 1015, 1024 (3d Cir. 1992). If no case directly speaks to the legality of the officer's conduct, the challenged conduct would need to be such that "reasonable officers in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." Giuffre v. Bissell, 31 F.3d 1241, 1255 (3d Cir. 1994) (quoting Good v. Dauphin Cty. Social Servs. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir.1989)). "Reasonableness under the second factor [of the qualified immunity analysis] is an issue of law for the district court to determine; however, if there are facts material to the determination of reasonableness in dispute, then that issue of fact should be decided by the jury." Barton v. Curtis, 497 F.3d 331, 335 (3d Cir. 2007)(citing Sharrar v. Felsing, 128 F.3d 810, 826–28, 832 (3d Cir.1997) (citation omitted)). Several facts material to the

---

warned him that he would be tased if he continued to resist; the officer even explained what tasing involved and did a "try fire" to show the student the electrical charge. Id. at 470. The student said "okay" and then continued to resist. Id. The officer then tased him lightly on the back in "dry stun" mode. Id. The student admitted that he was not hurt and instead that the tasing "tickled." Id. at 478.

In RT v. Cincinnati Public Schools, a district court found that the tasing of a minor at her high school was not excessive. No. 1:05cv605, 2006 WL 3833519, at *2 (S.D. Ohio Dec. 29, 2006). School officials called police to the school because the minor was causing a disturbance. Id. The student refused to comply with the officer's repeated orders and kicked, screamed, and bit the officer when he tried to seize her. Id. The officer then warned her several times that she would be tased if she did not calm down. Id.

In Maiorano ex rel. Maiorano v. Santiago, a district court found that the tasing of a high school student by a school resource officer was not excessive when the tasing was done to break up a gang fight. No. 6:05-cv-107-Orl-19KRS, 2006 WL 2024951, at *10 (M.D. Fla. Jul. 15, 2006). The gang fight in that case occurred on school grounds during the school day and involved 100 students gathering around four teenage girls who were physically fighting. Id. at *1. In that case, the officer only used his Taser on two students after his physical attempts to break up the fight were unsuccessful. Id. at *2.

The factual distinctions in these cases make it difficult for me to determine what kind of legal guidance these cases might offer to an officer in this Circuit.

The defendants cite to Brown and Patrick—both which were decided before the incident—to support their argument. See Brown, 484 Fed.Appx. at 681; Patrick, 536 Fed.Appx. at 259. Neither of these cases speak to the tasing of minors. For this reason, they do not dispose of the issue.

determination of reasonableness remain in dispute.[64] These disputes should be resolved by a jury, not the court.

For these reasons, a decision of whether Officer Ammary is entitled to qualified immunity would not be appropriate at this time.[65] The defendants may raise qualified immunity as a defense after the disputed issues of fact are resolved.

### b. Claims Against the City of Allentown[66]

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978)(emphasis in original). Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. The plaintiff asserts that the City Allentown is

---

[64] Besides the tasing of Ms. Wilson, Lieutenant Reinik testified that no other officers have deployed Tasers on minors in the district. See William Reinik Deposition, Doc. No. 67, Ex. E at 100. There is no information in the record to show whether every reasonable officer would have tased a minor.

[65] See Wilhere v. Delaware Cnty., CIVA 09-22, 2010 WL 1381664, at *7 (E.D. Pa. Apr. 1, 2010)(denying summary judgment on qualified immunity defense because factual disputes remained about reasonableness of officer's conduct); Reynolds v. Smythe, 418 F.Supp.2d 724, 735 (E.D. Pa. 2006)(denying summary judgment on qualified immunity because factual disputes remained about how the actual incident occurred); Garey v. Borough of Quakertown, No. 12–0799, 2013 WL 3305222, at *6 (E.D. Pa. Jul. 1, 2013)(denying summary judgment on qualified immunity defense because factual disputes about reasonableness of officer's conduct remained); Shultz v. Carlisle Police Dep't, 706 F.Supp.2d 613, 624 (M.D. Pa. 2010)(denying summary judgment on qualified immunity because factual disputes remained about whether a reasonable officer would have acted the same way).

[66] The plaintiff concedes that she is no longer arguing her Monell claim on the theory that Officer Ammary was a "rogue officer." She admits: "Discovery has shown that Officer Ammary was not a 'rogue officer,' but rather acting in accordance with the dangerous and constitutionally inadequate policies and procedures of the City of Allentown Police Department." For this reason, any argument under this theory is precluded going forward. See Plaintiff's Brief in Opposition to the Motion for Summary Judgment, Doc. No. 67 at 3.

Though the plaintiff titled her Monell claim as a "failure to control rogue officer," the plaintiff also pled that the Monell count was based on a failure to train. See Compl., Doc. No. 1 at ¶ 43.

liable because it failed properly to train its officers and because its Use of Force Policy was flawed. I will address each theory in turn.

### i. Failure to Train Claims[67]

The plaintiff argues that the City of Allentown failed properly to train Officer Ammary in two ways: 1) failing to train him on the differences between ordinary police work and police work in an educational environment, and 2) failing to train him on the proper use of a Taser.[68] Under § 1983, "[a] municipality may be liable for failing to train its employees if that failure amounts to deliberate indifference" so long as this failure is closely related to the plaintiff's ultimate injuries. A.M. v. Luzerne Cty. Juvenile Detention Ctr., 372 F.3d 572, 582 (3d Cir.2004)(citing City of Canton v. Harris, 489 U.S. 378, 389–90 (1989)).[69] This "deliberate indifference" satisfies the "policy or custom" element that would make a city liable under §1983.  Canton, 489 U.S. at 389.

While this type of claim is typically shown through a pattern of constitutional violations, "[a] single constitutional violation can still provide the basis for municipal liability for failure to train, ... but only where the 'need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights'

---

[67] The defendant argues that the Act 120 training for police officers mandated by state law is sufficient training to overcome Monell liability. This argument is unpersuasive. The Act 120 training does not specifically address the unique duties of an SRO nor the use of a Taser. See Regulations for Act 120 at § 203.51 (Course Requirements), available at http://www.pacode.com/secure/data/037/chapter203/037_0203.pdf.

[68] Plaintiff's Answer in Opposition to Motion for Summary Judgment, Doc. No. 67 at 13.

[69] See also City of Canton v. Harris, 489 U.S. 378, 389–90 (1989)("[T]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.")(explaining how the failure to train rubric is consistent with § 1983 analysis under Monell v. Dep't of Social Serv. of City of N.Y., 436 U.S. 658 (1978)); Campbell v. City of Philadelphia, 927 F.Supp.2d 148, 172 (3d Cir. 2013)(citations omitted)(explaining how a municipality may only be liable "if the failure to train 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'").

that the policymaker's inaction amounts to deliberate indifference." <u>Christopher v. Nestlerode</u>, 240 F. App'x. 481, 489–90 (3d Cir. 2007) (quoting <u>Canton</u>, 489 U.S. at 391)(quotation marks omitted).[70] "[T]he unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1361 (discussing <u>Bd. of Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 409 (1997)). One such example would be when a city arms its police with weapons and deploys police into the community to use those weapons on fleeing felons without training on the limits of deadly force. <u>Id.</u> (discussing <u>Canton</u>, 489 U.S. at 390 n. 10).

As I noted in my decision regarding the defendants' motion to dismiss, "the use of Tasers in the field is not dissimilar from <u>Canton</u>." <u>Geist v. Ammary</u>, No. 11–07532, 2012 WL 6762010, at *6 n. 19 (E.D. Pa. Dec. 20, 2012). Under this rationale, the need to train officers in how and when to use a taser gun to subdue a person during arrest could be "so obvious" and "highly predictable" such that a showing of repeated constitutional violations may be unnecessary. <u>See id.</u> at  *7.

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." <u>Canton</u>, 489 U.S. 378, 390-91 (1989). In determining whether a training program is adequate, a court must look to what tasks particular officers must perform. <u>Canton</u>, 489 U.S. at 390. The Third Circuit has outlined

---

[70] <u>See also</u> <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1360-61 (2011)(reaffirming <u>Canton</u>'s assertion that a municipality's deliberate indifference to a "highly predictable consequence" could be enough to establish a failure to train claim)(discussing <u>Bd. of Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 403 (1997)). <u>But see</u> <u>Berg v. Cty. of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000)("Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations.").

three elements a court should consider in determining whether a municipality's failure to train amounts to deliberate indifference: 1) whether municipal policymakers know that employees will confront a particular situation; 2) whether the situation involved a difficult choice or a history of employee mishandling; and 3) whether the wrong choice by an employee will frequently cause deprivation of constitutional rights. See Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999).[71]

### 1. Failure to Train as an Officer in an Educational Setting

The plaintiff argues that the need to train Officer Ammary as a School Resource Officer (SRO)—a police officer working in a school setting—was "so obvious" that a pattern of constitutional violations would not be necessary for the City to be liable under Monell.[72] Genuine disputes of material fact remain regarding whether the training provided to Officer Ammary and other SROs was adequate.

Testimony provided by Officer Ammary and Police Chief Hanna raise genuine questions about whether city policymakers knew that Officer Ammary and other SROs would consistently need to contend with large crowds of unruly teenagers. Police Chief Joseph Hanna testified during his deposition that seven SROs were placed in both high schools and middle schools in the Allentown area.[73] He recognized that these officers

---

[71] Under the first step, city policymakers must "know to a moral certainty" that police officers will be presented with the situation at issue in the case. Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999)(discussing Walker v. City of New York, 974 F.2d 293, 299 (2d Cir.1992)).

[72] See Plaintiff's Brief in Opposition to the Motion for Summary Judgment, Doc. No. 67 at 14.

[73] See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 131.

need special skills to work with juveniles.[74] Officer Ammary, too, admitted that juveniles

behave differently than adults.[75] He testified that students were typically less compliant,

requiring him to "escalate the commands" related to the use or threat of force.[76] Officer

Ammary was the only police officer assigned to the high school.[77] He testified that

"managing the student body, being there as a presence and as an assist to the

administration and the security officers" was a part of his job as an SRO.[78] Half of his

time was spent "dealing with students" while the other half was spent investigating

crimes.[79] He explained that fights involving gangs or weapons were common occurrences

---

[74] Chief Hanna testified that School Resource Officers are typically officers who are "good communicators" "with good demeanors" and who are "prepared to go into a classroom setting." See id. at 134.

[75] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 153. He also recognized that the "juvenile system was very different compared to the adult system." Id. at 27.

[76] See id. at 24.

[77] Officer Ammary specifically noted that he felt isolated by the role because the high school was across town from the police headquarters. He indicated concern over extra officers being able to report if an incident did occur. See id. at 113-14.

[78] Id.

[79] See id. at 23.

at dismissal.[80] Officer Ammary would report information about these incidents to his

supervisor.[81]

Nonetheless, the only training Officer Ammary received when he became an SRO

was to shadow another SRO.[82] Chief Hanna was aware of specialized training for officers

---

[80] Id. at  23, 75-76. Officer Ammary testified that he was monitoring dismissal "probably 90 percent of the time" and that he was responsible for handling situations that unfolded, as opposed to speaking with teachers or school administrators first. Id. at 72, 74-75. He described these dismissals as "chaotic" with "thousands of students being dismissed all at once." Id. at 75. He indicated that dismissals have included "stabbings," "shootings," "issues with weapons," and "machete attacks all at the high school levels during dismissals." Id. at 76. Reports of a fight at the school happened more than once a week. Id. at 81. According to Officer Ammary, a fight between rival gangs had happened near the school two days before the incident with Ms. Wilson. Id. at 82-83. Officer Ammary testified that "a peaceful dismissal" was "generally odd." Id. at 100.

Chief Hanna also testified that gangs have been an ever-growing problem in Allentown schools since the late nineties.  See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 131, 143. See also Jason Ammary Deposition, Doc. No. 67, Ex. C at 102 (indicating that the high school was "having a lot of other issues going on within the hallways with opposing gangs and wearing their colors and their beaded necklaces").

[81] In addition to filing a police report after-the-fact, Officer Ammary also testified that he had called into his supervisor to report the potential gang fight on the day of the incident. This information was supposedly relayed to the commander who determined that extra patrols were not necessary on the date of the incident. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 109. Officers from the middle school, however, were supposed to report to the high school after the middle school students dismissed to provide extra police presence. Id. at 113.

[82] Officer Ammary testified that his training was "nothing formal." His training included "[j]ust being transferred to the division," "[b]eing teamed up with the other resource officers prior to being assigned to a school," and "[s]hadowing, learning the paperwork system, the court system, et cetera." See Jason Ammary Deposition, Doc. No. 67, Ex. C at 25. See also id. at 28. Who he shadowed is unclear since he was the only officer assigned to the high school. See id. at 113-14.

Despite the fact that handling crowds of teenagers was a daily occurrence, Officer Ammary never received training in handling crowds beyond "going into bar crowds, rowdy crowds" and the use of force training. Id. at 29. He did not received training on how to handle crowds of minors. See id. at 30.

The defendants offer Officer Ammary's police academy record, educational and training requirements of his position, proof that Officer Ammary completed the required educational training, and a commendation award as evidence of his qualifications and trainings. See Ammary Montgomery County Community College Police Academy record, Doc. No. 65, Ex. B; Ammary Police Officer Appointment Letter from City of Allentown, Doc. No. 65, Ex. C (outlining educational certification requirements for police officer position); Letter from Commonwealth of Pennsylvania Municipal Police Officers' Education and Training Commission to Officer Ammary with certification, Doc. No. 65, Ex. D (dated Aug. 9, 2006); Letter from City of Allentown to Officer Ammary, Doc. No. 65, Ex. E (certifying that Officer Ammary had passed his agility test and background investigation, dated June 30, 2006); Ammary Award of Commendation Letter, Doc. No. 65, Ex. G (Apr. 17, 2008); Ammary 2010 Defensive Tactics Recertification, Doc. No. 65, Ex. I (Oct. 26, 2010); Ammary Taser Training Academy Certification, Doc. No. 65, Ex. J (Jul. 8, 2011); Letter from Commonwealth of Pennsylvania Municipal Police Officers' Education and Training Commission to Officer Ammary with certification, Doc. No. 65, Ex. K (dated Aug. 10, 2011); and Ammary Taser Training Academy Certification, Doc. No. 65, Ex. N (Jun. 7, 2013).

The defendants, however, do not offer evidence that this training addressed the skills needed for situations working with juveniles or teenagers. While Officer Ammary was given training on gang resistance, this training occurred in

through the National Association for School Resource Officers (NASRO).[83] NASRO

provided a 40-hour course to SROs, which explained "the role of a school resource

officer in the school setting, what some of the legal parameters are [of school resource

officer conduct,] and what they can do and what they can't do."[84]

Allentown did not provide this training, however, before placing its officers in a

school setting or at any time thereafter.[85] Officer Ammary testified that NASRO training

had been discussed, but he was never afforded this training due to budgetary

constraints.[86] The plaintiff's expert, however, found that the City of Allentown had a

budget surplus of $666, 830.00 in 2011—the year Officer Ammary became an SRO at the

high school level.[87] This evidence alone raises a genuine dispute over Officer Ammary's

lack of training, which would be material to the analysis of whether the City was

"deliberately indifferent" to potential constitutional violations.[88]

---

2008. It is unclear what the training involved. See Ammary Gang Resistance Education and Training (GREAT) Program Officer Training Certificate, Doc. No. 65, Ex. F (March 2008).

[83] Joseph Hanna Deposition, Doc. No. 67, Ex. F at 132.

[84] Id. at 133.

[85] Id. at 132. Chief Hanna also testified that the NASRO training may have included training of use of force on minors. However, he had not gone through the training for "so many years" that he could not know for sure. Id. at 133.

[86] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 25-26.

[87] See William T. Gaut Report, Doc. No. 65, Ex. U at 17.

[88] I will note though that evidence of the surplus would not be necessary for the City to be held liable for a lack of training but adds further support the plaintiff's claim that the City was "deliberately indifferent." "Financial constraints may not be used to justify the creation or perpetuation of constitutional violations…." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 392 (1992). See also Craft v. County of San Bernardino, 468 F.Supp.2d 1172, 1176, 1178 (C.D. Cal. 2006)("A lack of funds does not justify what is otherwise a constitutional violation."); Stone v. City and County of San Francisco, 968 F.2d 850, 858 (9th Cir.1992), cert. denied, 506 U.S. 1081 (1993)("[F]ederal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights."); N.G. v. Connecticut, 382 F.3d 225, 234 (2d Cir. 2004)("Mere convenience, however, cannot be a sufficient interest to justify such a serious impairment of privacy").

Evidence in the record also suggests a history of possible mishandling of students at dismissal which could amount to constitutional violations of students' rights. It was not uncommon for Officer Ammary and other officers to restrain certain students at dismissal simply to run background checks or ensure they didn't have outstanding warrants.[89] These actions served to "set[] the tone that police aren't messing around, that they mean business."[90] From these facts, a jury could find that it was foreseeable that a student could be injured during an arrest by a SRO who was inadequately trained in controlling crowds of teenagers and that the training that was offered to SROs was inadequate in these respects.[91]

### 2. Failure to Train on Proper Use of Tasers

The plaintiff also alleges that Allentown police officers were not properly trained in how to use Tasers because: 1) they were not properly trained on how to aim the Tasers,

---

[89] Officer Ammary testified that he and other officers carried out this sort of routine "at countless dismissals at Allen Dieruff and middle schools." See Jason Ammary Deposition, Doc. No. 67, Ex. C at 161. Before the incident with Ms. Wilson, he had "many times before" removed students from dismissal and placed them in a police car to "[c]heck, just run through the routine" of "[c]hecking them for warrants" to "[p]ositively identify who they are." Id. at 157. See also id. at 162, 190.

[90] See id. Officer Ammary explained that his physical removal of students at dismissal was meant to send the message that "it's not just false promises. He is going to take action." Id. at 161.

[91] See A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 583 (3d Cir. 2004)(finding that the evidence supported an inference that the potential for conflict between residents of a juvenile detention center was high, making summary judgment inappropriate on the failure to train claim against the center); Bd. of County Com'rs of Bryan County v. Brown, 520 U.S. 397 (1997) ("[A] high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable."). See also Shultz v. Carlisle Police Dept., 706 F.Supp.2d 613, 625 (M.D. Pa. 2010)(denying summary judgment in finding that evidence showed that the training of the officers in dealing with ill and mentally ill persons was "so inadequate as to represent deliberate indifference to citizens' constitutional right"); Connick v. Thompson, 131 S.Ct. 1350, 1366 (2011)(finding that Brady violation not within "single incident" liability hypothesized in Canton because prosecutors receive other legal training—in law school and beyond).

and 2) they were not trained to never aim the Taser at "sensitive" areas such as the groin.[92]

There is a genuine dispute of material fact as to whether the Allentown police department's training on how to aim the Taser was appropriate. Allentown police began using Tasers in July 2011, just before Ms. Wilson was tased.[93] Officer Ammary testified that he was trained to aim the laser at the quadrant of the person's body he hoped to hit.[94] Lieutenant Reinik, the Taser instructor for the Allentown Police Department, confirmed that this was the way Ammary and other officers were trained to use Tasers.[95] This training was consistent with what Officer Ammary testified he did when he tased Ms. Wilson, striking her in the groin. He pointed the Taser at her "lower torso" without using the lights.[96] The plaintiff's expert, however, indicated that officers can more accurately aim a Taser like the one used by Officer Ammary in order to better predict where the probes will hit. Lieutenant Reinik confirmed that police could better predict where the bottom probe might hit.[97] Yet, when he explained how he trained officers in aiming the

---

[92] See Plaintiff's Brief in Opposition to the Motion for Summary Judgment, Doc. No. 67 at 17.

[93] See William Reinik Deposition, Doc. No. 67, Ex. E at 29-35; Ammary Taser Training Academy Certification, Doc. No. 65, Ex. J (Jul. 8, 2011).

[94] Jason Ammary Deposition, Doc. No. 67, Ex. C at 36. Officer Ammary testified during his deposition that:
> Just you split the quadrants, bottom and top, so it would be anywhere, and generally that laser signifies where that top prong is going to hit, and it's just too much math for me to figure out to tell you exactly where, with distance and everything, with time, where that lower prong is going to hit.

Id. at 37-38.

[95] See William Reinik Deposition, Doc. No. 67, Ex. E at 50.

[96] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 38.

[97] See William T. Gaut Report, Doc. No. 65, Ex. U at 15. Lieutenant Reinik admitted that the Taser's laser should be aimed at where the top probe would need to hit and that the bottom probe would hit at an 8-degree angle downward. The further an officer is from a subject will affect the placement of the bottom probe. See William Reinik Deposition, Doc. No. 67, Ex. E at 49. Officer Ammary's testimony gives no indication that he was trained on how

Taser, it was not clear that this information regarding the bottom probe placement was relayed to officers.[98]

There is also a genuine dispute of material fact as to whether Officer Ammary was advised not to target sensitive areas, specifically the groin and back.[99] Lieutenant Reinik confirmed that he warned officers to avoid the heart and head but did not specifically warn officers  to avoid the groin and back.[100] In fact, he instructed officers to deploy the Taser so that bottom probe hit "below the belt" and to aim for the "middle of the back."[101] Yet, he also testified that one of the training slides he gave officers told them not to "intentionally target genitals."[102] Officer Ammary testified that he was only warned not to aim for the face, head, throat, or heart.[103]

According to the plaintiff's expert, both of these practices contradict known risks about Tasers at the time the officers were trained.[104] TASER® warned that a probe hitting

---

the distance from the subject would affect the bottom probe. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 37-42.

[98] See William Reinik Deposition, Doc. No. 67, Ex. E at 50-53.

[99] On August 20, 2011, Officer Ammary deployed his Taser on a suspect fleeing the scene of a shooting. Officer Ammary aimed at the suspect's upper left back. See Torres-Velazquez Police Report, Doc. No. 65, Ex. L (explaining Officer Ammary's Taser incident prior to his incident with Ms. Wilson).

[100] See William Reinik Deposition, Doc. No. 67, Ex. E at 59. He testified that officers could tase suspects in the back though he himself "questioned that the heart is just as close to the back as it is to the front." Id.

[101] See id. at 50, 59. He further explained that this practice would likely result in a probe hitting the groin. Id. ("You can't try to avoid having the lower probe I would assume go towards the groin.").

[102] See Taser Training Slide, Doc. No. 65, Ex. GG.

[103] See Jason Ammary Deposition, Doc. No. 67, Ex. C at 35.

[104] The defendants argue that the plaintiff's expert cannot be considered when ruling on the defendants' motion. However, the case law they cite for this proposition is not on point with this argument. Those cases were ruling on whether plaintiff's experts were qualified to testify under Daubert, not whether the information they provide could be considered at all. See Brown v. Burghart, No. 10–3374, 2012 WL 1900603, at *5 (E.D. Pa. May 25, 2012)(discussing the admissibility of expert evidence related to a Daubert motion and explaining that an expert could not speak to the ultimate issue of the case but could testify about general police practices); Damiani v.

the genital area would cause serious injury.[105] The Allentown Police Department began

using Tasers later than many other districts in the country.[106] Under these circumstances,

a jury could find that the department should have known of the potential risks Tasers

posed and that the City was "deliberately indifferent" to the risks improper training could

pose.

This evidence by the plaintiff raises genuine issues of fact about whether the

department's Taser training was adequate. A reasonable jury could find that had the

training been adequate the injury to Ms. Wilson could have been avoided.[107]

### ii.  Defective Use of Force Policy

The plaintiff claims that the Allentown Police Department's Use of Force Policy

was unclear and insufficiently offered officers guidance on when to use force and what

level of force was appropriate.[108] Specifically, the policy does not explain what types of

force are appropriate when officers are dealing with children and teenagers.[109] The

---

Momme, Civil Action No. 11–2534, 2012 WL 1657920, at *2 (E.D. Pa. May 11, 2012) (striking expert's report on Daubert motion because it was not timely submitted but explaining that the expert could speak to common police procedures so long as the expert doesn't answer the ultimate questions of the case); Tschappat v. Groff, Civil Action No. 3:CV–01–2279, 2004 WL 5509087, at *4 (M.D. Pa. June 2, 2004) (on a Daubert motion, finding that plaintiff's expert "permitted to testify if, in his opinion, [the defendant's] conduct was in conformance with standard police procedures based on his extensive law enforcement background," but not about whether the defendant's "use of force in [that] case was unreasonable and excessive"). The expert's explanation of what police practices are common may be used to show that a dispute of material fact exists. See Tschappat v. Groff, Civil Action No. 3:CV–01–2279, 2004 WL 5509087, at *4 (M.D. Pa. June 2, 2004).

[105] See William T. Gaut Report, Doc. No. 65, Ex. U at 15.

[106] See William Reinik Deposition, Doc. No. 67, Ex. E at 29, 38.

[107] See Wilhere v. Delaware Cnty., CIVA 09-22, 2010 WL 1381664, at *8 (E.D. Pa. Apr. 1, 2010)(finding that the county's deficient training on taser use satisfied Carter's three part test).

[108] See Plaintiff's Brief in Opposition to the Motion for Summary Judgment, Doc. No. 67 at 19.

[109] This policy was not necessarily one followed by other police departments at that time. See Richards v. Janis, No. CV-06-3064-EFS, 2007 WL 3046252, at  (E.D. Wash. Oct. 17, 2007)(discussing how the Yakima Police Department's Taser policy provided that "Extra caution shall be given when considering use of a Taser on the

plaintiff also attacks whether the defendants' policy on Taser usage is appropriate. This claim overlaps with the plaintiff's failure to train officers on the appropriate use of Tasers.

The Use of Force Policy states: "Department members shall use only the amount of force which is necessary and reasonable to control the situation, effect an arrest, overcome resistance to arrest, or defend themselves or others from harm. No officer will use unreasonable or excessive force toward any person."[110] It goes on to say: "officers shall use only that level of force on the force continuum that is reasonably necessary to de-escalate the incident and bring it under control."[111] The Policy indicates that the continuum of force moves from officer presence to verbal control to physical control to less lethal weapons to the use of a canine and then to deadly force.[112]

It goes further to say that "[w]hen the use of force is necessary, the degree of force that is employed should be in direct relationship to the amount of resistance employed by the person or the immediate threat the person poses to the officer or others."[113] The Use of Policy states that officer may use Tasers "against violent crowds, violent suspects not

---

following individuals: juveniles under 16 years of age, pregnant females, elderly subjects, handcuffed persons, and persons in elevated positions."); Russell ex rel. J.N. v. Virg-In, 258 P.3d 795, 808 n. 70 (Alaska 2011)(explaining how the use of tasers on children may not be appropriate, citing to a paper from the International Association of Chiefs of Police National Law Enforcement Policy Center published in 1996).

[110] Allentown Police Department General Order 4-14 (Use of Force Policy); Effective Apr. 27, 2011, Doc. No. 65, Ex. O at 4.14.05B1.

[111] Id. at 4.14.05E.

[112] Id. at 4.14.05B3, 4.14.05F.

[113] Id. at 4.14.05B2.

armed with firearms, mentally disturbed person[s] exhibiting aggressive behavior, and in support of tactical operations."[114]

The record raises questions of material fact about whether the Use of Policy or the Taser training adequately addressed when the use of a Taser was an appropriate use of force. Lieutenant Reinik agreed that the Taser training taught officers "how to use [the Taser] but not when" to use the Taser.[115] Lieutenant Reinik and Chief Hanna admit to relying almost entirely on TASER®'s materials in preparing their training program.[116] Guidance put out by the Department of Justice warns against police departments relying heavily or solely on the materials provided by TASER®, the manufacturer, in its training of officers.[117] The Department of Justice recommends that police departments incorporate their Taser training into use of force policies.[118]

---

[114] Id. at 4.14.05F4. See also id. at 4.14.05N ("Extended Range Impact Devices").

The plaintiff's expert also contends that this Policy is flawed because it does not define reasonable in relation to the other Graham factors a police officer should consider, such as the severity of the crime, how dangerous the person may be, or whether the person is armed. See William T. Gaut Report, Doc. No. 65, Ex. U at 18. Chief Hanna and Officer Ammary confirmed that the policy's focus was more on the actions of the suspect, not the crime nor how armed or violent the person may potentially be. See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 69, 73-77; See Jason Ammary Deposition, Doc. No. 67, Ex. C at 47.

[115] William Reinik Deposition, Doc. No. 67, Ex. E at 44.

[116] See id. at 27, 43, 82-84 ("[A]nybody can go on Taser International and look at their suggestions for policies for the police departments, and I think you will find it almost word for word similar to what we have in there." "[W]e use Taser's course. It doesn't go into exactly detail that you will use this like the Allentown Police Department's…use of force continuum does."); Joseph Hanna Deposition, Doc. No. 67, Ex. F at 40.

[117] The City of Allentown's training was based information provided by the TASER® Company itself. See Ammary Taser Training Academy Certification, Doc. No. 65, Ex. J (Jul. 8, 2011). As the plaintiff's expert notes, the U.S. Department of Justice advises: "Departments should not solely rely on training curriculum provided by a [Conducted Energy Device or] CED manufacturer. Agencies should ensure that manufacturers' training does not contradict their use-of-force policies and values. Agencies should ensure that their CED curriculum is integrated into their overall use-of-force systems." See William T. Gaut Report, Doc. No. 65, Ex. U at 19 (quoting U.S. Department of Justice, Office of Community Oriented Policing Services, Conducted Energy Devices: Development of Standards for Consistency and Guidance, Nov. 2006).

From the record, there is a genuine dispute of material fact about whether the Allentown Police Department did integrate the Taser training into its use of policy adequately. It is unclear who developed the Department's Taser Policy and whether already known risks about Tasers were considered in crafting the policy.[119] Officer Hanna, the director of the police academy, testified that he "did not have any part in the creation or the development or authoring of [the Taser or use of force] policies."[120] Lieutenant Reinik also said he was not consulted when the policy was put into place.[121] In addition, Officer Ammary was trained on the Use of Force Policy, which supposedly discussed use of a Taser. This training, however, was offered six months before the police department was approved for the use of Tasers and six months before the Taser Policy was added to the Use of Force Policy.[122]

---

Chief Hanna indicated that "some of the verbiage in here was drawn from Taser International and was incorporated into our procedure for deployment." See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 40. He wasn't sure if it was taken verbatim from Taser's language. Id.

[118] See William T. Gaut Report, Doc. No. 65, Ex. U at 19 (quoting U.S. Department of Justice, Office of Community Oriented Policing Services, Conducted Energy Devices: Development of Standards for Consistency and Guidance, Nov. 2006).

[119] Chief Hanna and Lieutenant Reinik testified that the Use of Force Policy itself was provided by a private company called Protective Safety Systems. See William Reinik Deposition, Doc. No. 67, Ex. E at 18-19, 90-91; Joseph Hanna Deposition, Doc. No. 67, Ex. F at 107. Lieutenant Reinik explained that the Taser course does not "go into exactly detail that you will use this like the Allentown Police Department's Protective Safety Systems use of force continuum does." See William Reinik Deposition, Doc. No. 67, Ex. E at 42-43. He recognized that the Taser information in the training materials was not that specific. Id. at 43. From the record, it does not appear that Protective Safety Systems' policy addressed the use of Tasers. Id. at 20-30. Lieutenant Reinik names one officer he believed helped write the Taser Policy but also noted that the policy appeared to be taken mostly from TASER®'s training materials. Id. at 26-27. Chief Hanna also explained that the information in the use of force continuum came from Protective Safety Systems and from Taser International. Joseph Hanna Deposition, Doc. No. 67, Ex. F at 38-39. Chief Hanna also believed that the Taser policy was drawn directly from Taser International's training materials. Id. at 40. See also id. at 40-43.

[120] See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 13.

[121] See William Reinik Deposition, Doc. No. 67, Ex. E at 30 ("[W]e had really no input into the Taser policy.").

[122] See 2010 Defensive Tactics Recertification, Doc. No. 65, Ex. I (Oct. 26, 2010); Joseph Hanna Deposition, Doc. No. 67, Ex. F at 37; William Reinik Deposition, Doc. No. 67, Ex. E at 16-17 (stating that Tasers were not a part of

Furthermore, there remains a question of whether the training materials and the Use of Force Policy provided officers with appropriate guidance on when the use of a Taser on a minor was appropriate. Lieutenant Reinik could not remember if the Taser training itself addressed when the use of a Taser on a minor was appropriate.[123] The training simply said "Avoid using on children" without much further explanation.[124] When asked about the Use of Force policy's guidance on juveniles, Officer Ammary testified that the officers' priority was not on "age or size."[125] Whether the use of a Taser on a child was appropriate was left to the discretion of the officer.[126] While the department's Taser training materials do advise officers not to use the Taser on "small children," this phrase is ambiguous and not well-defined. Officer Ammary himself indicated that he would not Taser a child of age eleven but thought tasing a fourteen-year-old was appropriate.[127] Why one was appropriate and not the other was unclear. Given that seven officers were placed in City schools with Tasers, the department's lack of guidance on what type of force may be used on children and teenagers and lack of guidance on when tasing juveniles was appropriate could amount to "deliberate indifference."

---

the policy until April 2011); See Jason Ammary Deposition, Doc. No. 67, Ex. C at 33 (stating that the use of force training was done "generally" prior to the Taser training).

[123] William Reinik Deposition, Doc. No. 67, Ex. E at 65.

[124] Id. at 66-67.

[125] Jason Ammary Deposition, Doc. No. 67, Ex. C at 54.

[126] Id. at 68.

[127] See id. at 35.

There also remains a genuine dispute of fact about whether the Use of Force

Policy's lack of guidance on when to use a Taser encouraged officers to overuse Tasers

as a tool of force.[128] The defendant's expert "found no evidence that [the Allentown

Police Department] encouraged the use of [Conducted Electrical Weapons (a.k.a Tasers)]

in all situations."[129] However, the Taser firing record for the Taser used in this incident

offers a different picture. The Taser used in the incident with Ms. Wilson was fired close

to 150 times between the officers' Taser training in July 2011 and the incident with Ms.

---

[128] Another point of dispute if whether Officer Ammary should have verbally warned Ms. Wilson that he was deploying his Taser. A number of cases involving Taser usage look at whether an officer warned a suspect that the person might be tased before deploying the Taser. See, e.g., Ickes v. Borough of Bedford, 807 F.Supp.2d 306, 313, 324 (W.D. Pa. 2011)(finding that arresting officer's tasering of a handicapped individual was appropriate after the plaintiff was warned that he might be tasered and the plaintiff responded, "Go ahead and taser me."); Zivojinovich v. Barner, 525 F.3d 1059, 1071–73 (11th Cir. 2008) (per curiam)(use of a taser to subdue a suspect who had repeatedly ignored police instructions and continued to act belligerently found to be reasonably proportionate to the need for force).

The Allentown Police Department's Use of Force Policy states that officer should announce that they are tasing a person before doing so. This policy is meant to "alert other officers, as well as to provide the subject an additional opportunity to cease the conduct that has given rise to the deployment of the Taser." See Allentown Police Department General Order 4-14 (Use of Force Policy), Effective Apr. 27, 2011, Doc. No. 65, Ex. O at 4.14.05M. "Verbal commands should be used constantly before (whenever practical), during, and after the deployment of the Taser to warn the subject to cease his/her aggressive demeanor or action." Id.

According to Chief Hanna, however, the primary purpose of the constant verbal commands before tasing was not to offer the subject another opportunity to cease the objectionable conduct. See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 121. In his opinion, "if an officer has found reason to deploy the Taser, generally that's done in a matter of seconds…" Id. He indicated that officers were trained to only verbally warn when possible and that an officer must simply yell " 'Taser, Taser, Taser,' and then pull the trigger." Id. at 110. Yet. Lieutenant Reinik testified that that the Tasers were specifically chosen to be yellow in order to serve as a deterrent. The hope was that "when the Taser is brought out to say, you know, "I don't want to get tased, I don't want you to tase me, and I give up." Id. at 39.

Officer Ammary did not verbally warn Ms. Wilson before tasing her. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 186, 190. Officer Ammary claimed he had been trained to verbally warn before tasing but did not do so because it was not required depending on the situation. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 191. He estimates that less than two seconds elapsed between the time he stepped away from Ms. Wilson and when he tasered her. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 186, 190. Ms. Wilson claims the entire encounter lasted maybe a whole minute from initial contact to her tasing. See Keshana Wilson Deposition, Doc. No. 67, Ex. 2 at 144.

[129] See Richard A. Guilbault Expert Report, Doc. No. 65, Ex. S. at 15.

Wilson at the end of September 2011.[130] Resolving all disputes in favor of the plaintiff, a

jury could find that the Use of Force Policy as it related to Taser usage was inadequate in

guiding officers on when it was appropriate to use the Taser as a tool of force.[131]

Evidence in the record also shows that supervisors in the Allentown Police

Department were "deliberately indifferent" to the risks this lack of guidance posed.[132]

The Use of Force Policy itself required the Assistant Chief of Police to review these

incidents.[133] Whether this sort of review actually occurred is unclear.[134] Despite

numerous incidents which had caused serious injuries to tased persons, the Police

---

[130] See Taser #X00-567033 Firing Record, Doc. No. 65, Ex. AA. From the record, it isn't clear if this Taser was only used by Officer Ammary or by other officers. Officer Ammary testified that he remembered only "several deployments" prior to the incident with Ms. Wilson. See Jason Ammary Deposition, Doc. No. 67, Ex. C at 31. Given that it was fired almost daily, it would seem reasonable to think that other officers may have used the weapon. Nonetheless, whether it was used only by Officer Ammary or other officers the number of firings is substantial and could support the plaintiff's claim that the Use of Force Policy related to Tasering was inadequate. A jury could find that this evidence alone shows the policy was inadequate.

[131] In addition, there is a dispute about how often Tasers were used. Lieutenant Reinik estimated that there were only 100 Taser deployments from April 2011 to June 27, 2013, when his deposition was taken. See William Reinik Deposition, Doc. No. 67, Ex. E at 99. The Taser Deployment Record provided in the record for a single Taser on the force, however, shows close to 150 deployments between July 2011 and September 2011. See Taser #X00-567033 Firing Record, Doc. No. 65, Ex. AA (2/3/11 to 9/30/11).

[132] The defendants argue that summary judgment on this Monell claim in their favor is appropriate based on Sallie v. Lynk, No. 2:10cv456, 2012 WL 995245, at *9 (W.D. Pa. Mar. 23, 2012). This case is factually distinguishable and not helpful. Sallie determined the training was adequate because "[t]here is no evidence that this entire regiment of training somehow overlooks a critical area where citizens' constitutional rights are placed in jeopardy." Id. at *9. While Sallie involved the use of taser for a dry stunning the plaintiff in that case, the plaintiff was an adult who was ordered to stop resisting arrest but failed to comply. Id. at *2. The exchange that occurred prior to Sallie's arrest was more extensive and involved Sallie yelling at the officers, who had been called to his house due to complaints of a loud party. Id.

[133] The Use of Force Policy states: "The Assistant Chief of Police of Operations shall review all use of force reports to determine adherence to policy and procedures, completeness of the report, and to detect and correct any training deficiencies." See Allentown Police Department General Order 4-14 (Use of Force Policy), Effective Apr. 27, 2011, Doc. No. 65, Ex. O at 4.14.05H3.

[134] The review date for the policy is April 2014—three years after the policy went into effect. See id. at 1. It is unclear if it has been amended since this date, since depositions in this case were taken before this time. Nonetheless, the record shows other deficiencies in monitoring of the policy. Lieutenant Reinik, the Taser Control Manager, did not establish any system for maintaining statistics on performance of the Taser, despite this being a part of his job description. See William Reinik Deposition, Doc. No. 67, Ex. E at 103, 105. He was under the impression that this was the responsibility of the Office of Administrative Personnel. Id. at 104.

Department did not amend or revise the Policy to better guide the officers in the use of

their Tasers.[135] For example, one suspect was hit in the back of the head by a Taser probe

causing him to go into a seizure.[136] This lack of review and revision could be viewed as

showing "deliberate indifference" on the part of the defendants, after all factual disputes

are resolved in favor of the plaintiff.[137]

Resolving all of these disputes in favor of the plaintiff, a jury could find that the

Police Department's Use of Force policy was deficient and that this deficiency caused

Ms. Wilson's injury, making the City liable under Monell.

---

[135] Lieutenant Reinik estimated that one in ten of the tasing incidents involved injuries to the suspect. William Reinik Deposition, Doc. No. 67, Ex. E at 101. Of the one hundred tasing incidents reviewed by the Department's Taser Review Board, none were found to be inappropriate. Id. Reinik admits that these incidents may not have been a "best practice" of that "more thought should have [gone] into the actual use of the Taser." Id. at 102. See also Joseph Hanna Deposition, Doc. No. 67, Ex. F at 128-29 (explaining how the Taser Review Board has never found a violation of the policy though may not be a "best practice"). Nonetheless, the Department's Taser Policy was not updated following these incidents. See William Reinik Deposition, Doc. No. 67, Ex. E at 72-73, 106. Prior to the policy being implemented, no officers in the Department had used Tasers in practice. The only electronic control device that had been used, by comparison, was a stun baton used only on aggressive dogs (not humans). Id. at 74-75. This raises a question of whether the officers, unfamiliar with this type of technology as it pertained to humans, should have been given more guidance.

Lieutenant Reinik, the Department's Taser trainer, testified: "I have never seen a reason or a need to address to the chief of police that we need to do something different with the Taser program." Id. at 107. Chief Hanna admits he did not review any of the incidents. See Joseph Hanna Deposition, Doc. No. 67, Ex. F at 121-25.

[136] See William Reinik Deposition, Doc. No. 67, Ex. E at 100.

[137] The plaintiff argues these points as "Ratification" of Officer Ammary's actions. She bases this theory on a Ninth Circuit case which has little relevance to this case and is non-binding on this court. See Trevor v. Gates, 99 F.3d 911, 918 (9th Cir. 1996)(explaining that municipal liability under Section 1983 may be established when "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it" under Ninth Circuit law)(quoting Gillette v. Delmore, 979 F.2d 1342, 1346–47 (9th Cir.1992)). Though this characterization of the arguments is not entirely correct, I will treat these points as evidence of "deliberate indifference" because the plaintiff argues to this effect under this section.

## IV.  CONCLUSION

Genuine disputes of material fact remain on both the claim against Officer Ammary and the claim against the City of Allentown. For the reasons stated above, I will deny the defendants' motion for summary judgment.[138]

An appropriate Order follows.

---

[138] The defendants requested an Oral Argument be held on this motion. See Defendants' Reply in Support of the Motion for Summary Judgment, Doc. No. 68, Ex. A at 2. I did not think this necessary because the motion was thoroughly briefed and could be decided on the papers.